## A01A2319. CULVER v. THE STATE.
## A01A2339. KELL v. THE STATE.
### (562 SE2d 201)

RUFFIN, Judge.

A Fulton County grand jury indicted Michael J. Kell and Michael D. Culver for conspiracy to defraud the State, Medicaid fraud, false writings, and, as to Kell, three counts of tax evasion. Following a bench trial, the trial court found Kell and Culver guilty of the charged offenses. They appeal, primarily challenging the sufficiency of the evidence and venue. For reasons that follow, we affirm in part and reverse in part the convictions of both defendants.[1]

Viewed favorably to support the verdict,[2] the evidence shows that Kell, a medical doctor, founded Private Clinic and Private Clinic Laboratories ("PCL"), which were located in the same building in Fulton County. Culver worked for Kell, helping with Kell's daily business activities and acting as his "right hand man."

Both Kell and PCL were enrolled as Medicaid providers with the Georgia Department of Medical Assistance ("DMA"), the state agency that administered the Medicaid program. In the early 1990s, Kell individually billed Medicaid millions of dollars annually as a physician provider in Georgia's methadone drug treatment program. During this time, PCL submitted only a small volume of Medicaid billings. Around 1996, however, the DMA discontinued the methadone program, ending Kell's significant reimbursements for methadone treatments.

Also in 1996, Kell became concerned about the legality of referring his Medicaid patients to a laboratory that he owned. Accordingly, he agreed to sell PCL's assets to Servicios Medicos Panamericanos Sociedad ("Servicios"), a Costa Rican corporation, for $300,000, payable over five years. Ecomed Labs, LLC, a corporation organized

---

[1] We note that the statement of facts in appellants' combined brief has been completely unhelpful in resolving these appeals because it does not contain a single record reference.

[2] See *Ney v. State*, 227 Ga. App. 496 (489 SE2d 509) (1997).

by Kell's attorney and in which Servicios held 98 percent of the ownership, took over PCL's laboratory operations. Kell employees Mark Bailey and Patsy Lewis were told that each owned one percent of Ecomed's stock, although they never paid for the stock, received a stock certificate, or earned any stock dividends.

Following the sale, various Kell employees began working for Ecomed, and Kell served as Ecomed's laboratory director, as well as an Ecomed corporate officer. Bailey was also appointed trustee of a trust Servicios created to operate Ecomed. Bailey acted in that capacity until 1997, when Kell became trustee.

After taking over PCL's operations, Ecomed became a Medicaid provider and granted to Michael Jon Kell, M.D., Ph.D. & Associates, P.C. ("Kell P.C."), one of Kell's corporations, a power of attorney to submit electronic claims to DMA for Medicaid reimbursement. In 1996, after the State discontinued the methadone program, Ecomed began submitting Medicaid billings to DMA in excess of $1 million, which caught the attention of DMA investigators. As described by one DMA employee, the billings from Kell and the laboratory "almost swapped." When the methadone program ended, billings "in excess of a million dollars . . . started coming out of the laboratory."

DMA investigators reviewed Ecomed's Medicaid records and determined that the laboratory was submitting a high volume of billings for urine drug testing on a small patient base, charging Medicaid $25,000 to $30,000 annually per patient for these tests. Investigators further discovered that "testing was occurring with such a frequency that the results would not be back from the first test before [the patients] were given their second or sometimes third test in a week." The billings also revealed that Kell referred these patients to Ecomed through Private Clinic.

For urine drug tests conducted between September 1996 and November 1997, Medicaid paid Ecomed between $180 and $204 per test. These tests, often run on a patient twice a week, screened for multiple drugs, such as amphetamines, barbiturates, alcohol, and methadone. The individual cost to screen for each drug factored into the overall price.

In contrast, Michael Kulas, a Kell employee who worked with the billing system, testified that Ecomed charged self-pay patients referred by the Grady Hospital Drug Dependence Unit just $19.20 for a urine drug test. Invoices generated throughout the summer of 1996 also confirmed that Ecomed charged Grady Hospital $19.20 to test a patient's urine, and the evidence showed that Ecomed conducted urine drug tests on Grady patients during the September 1996 through November 1997 time period. The documentary evidence does not reveal which individual drug screens were included in those tests. But Kulas testified that the tests conducted on Grady self-pay

patients were the same as those run on Medicaid patients. Ecomed's lab manager similarly testified that she knew of no difference between the urine tests performed on patients referred by Grady and patients referred by Private Clinic, such as the Medicaid patients.

Investigators also discovered that, in 1994, PCL, through Kell, bid for a contract with Grady Health System to perform drug testing on Grady patients. The proposal recommended that patients be tested at least weekly for methadone and opiates to detect abuse. According to the proposal, however, drugs such as amphetamines, barbiturates, propoxyphene, and alcohol "[could] be adequately monitored through once a month testing in persons without recent histories of abuse." Thus, PCL advocated that Grady "test for all drugs [listed in the proposal] at least once a month on a random schedule, except for opiates and methadone (and prescribed/*abused* drugs in any particular patient) [which should] be tested at least once a week on a random schedule."[3] Despite this recommendation, between August 1996 and November 1997, Ecomed screened certain Medicaid patients well over once per month for amphetamines, barbiturates, propoxyphene, and alcohol, even when those patients showed no recent history of abuse.

In addition to this Medicaid-related evidence, the State introduced testimony and documents involving taxation. In 1995, the employee leasing company that processed the payroll for various Kell-related companies ("employee leasing") issued Kell a W-2 form reporting that he earned $342,457.81 in wages. The following year, Kell received $23,000 in miscellaneous income from Ecomed, wages totaling $25,798.56 from employee leasing, and $34,496 in compensation as an officer of Kell P.C. As an officer in PCL, Kell also earned $204,022 in compensation for the October 1, 1995 through September 30, 1996 fiscal year, and $121,539 from October 1, 1996, through September 30, 1997. In 1997, employee leasing reported $165,340.75 in wages for Kell, and he also earned $27,600 as a Kell P.C. corporate officer. The evidence further showed that, in 1998, Kell received $67,456 from employee leasing and $194,325 from UD Testing, a company that employed Kell as its research director.

Despite earning significant income between 1995 and 1998, Kell paid no state income taxes for those years. In 1995, he filed a state tax return reporting just $178 in adjusted gross income and claiming $47,078 in itemized deductions. Kell also asserted that he was entitled to a $1,125 refund, the amount employee leasing withheld from his wages for state income tax purposes. The State's tax expert testified, however, that, even with the claimed deductions, Kell earned

---

[3] (Emphasis supplied.)

$293,580 in 1995 taxable income, giving him state tax liability of $17,442.80. In 1997, the State Revenue Department sent Kell a proposed tax assessment for taxes due in 1995. Kell denied any tax liability and submitted several affidavits to the Revenue Department stating that he was not subject to compulsory federal and state income tax laws, which, in his opinion, applied only to federal and state employees. Kell did not file a state tax return in 1996, 1997, or 1998.

Michael Culver apparently shared Kell's tax views. The evidence showed that in 1995, he earned $43,087.92 in wages. Based on these wages, the State's tax expert determined that Culver earned $39,288 in taxable income and owed $2,167 in 1995 state income taxes. Nevertheless, Culver reported no taxable income on his 1995 return and, like Kell, claimed a refund equaling the approximate amount of state income tax withheld from his wages — $290. When assessed by the Revenue Department for unpaid 1995 taxes, Culver refused to pay, submitting instead an affidavit virtually identical to those signed by Kell.

In both 1996 and 1997, Kell provided withholding exemption certificates to employee leasing, asserting that because he had no tax liability the prior year and would not incur liability that year, he was exempt from tax withholding requirements. Although employee leasing found these certificates questionable, it honored them and did not withhold federal or state income taxes from checks distributed to Kell in 1996 and 1997.

At some point, Kell and Culver also established the First Meliorite Church, which met in Private Clinic's offices and had only three members, Kell, Culver, and Bailey. Kell and Culver opened two bank accounts in the church's name. Between 1996 and 1999, Kell deposited numerous checks he received from employee leasing and UD Testing into one of those accounts. After analyzing that account, the State's expert in summary financial data concluded that Kell used it to pay significant personal expenses during those years, including mortgage payments on his home, child support payments, and high school tuition payments.

Based on the evidence presented, the trial court found Kell and Culver guilty of the indicted charges. Kell appeals his convictions in Case No. A01A2339, and Culver appeals in Case No. A01A2319.

### Case No. A01A2339[4]

1. Kell argues that the State failed to present sufficient evidence to prove Medicaid fraud. In addressing this argument, we must con-

---

[4] For ease of discussion, we will address these companion appeals in reverse order.

sider whether "the evidence, construed favorably to support the verdict, was sufficient to authorize the [factfinder] to find him guilty beyond a reasonable doubt of [this offense]."[5] As discussed below, the State failed to establish venue beyond a reasonable doubt, requiring reversal.[6] Because the State presented sufficient evidence of Kell's guilt, however, "the Double Jeopardy Clause does not preclude the State from retrying [him], so long as it does so in a forum in which venue is properly established."[7]

(a) *Sufficiency of Evidence to Prove Guilt.* In the indictment, the State charged that, between September 16, 1996, and September 15, 1997, Kell obtained "payments from the Georgia Department of Medical Assistance . . . to which [he was] not entitled and in excess of what [he was] entitled, by [a] fraudulent scheme and device," in violation of OCGA § 49-4-146.1 (b). Describing the fraudulent scheme, the State alleged that PCL's sale to Servicios was a sham, leaving the lab and its profits in Kell's control; that Kell charged Medicaid a higher rate for urinalysis drug screens than he charged Grady Health System; and that he billed Medicaid for medically unnecessary drug tests.

To support these allegations, the State presented evidence that neither Kell nor PCL received any portion of the $300,000 asset sale price from Servicios. Furthermore, following the purported sale, PCL's lab manager continued to perform her same duties at the lab, Kell ran the lab and served as an Ecomed officer, and Ecomed gave Kell P.C. power of attorney over its Medicaid billings. Kell also sent a letter to the lab's clients explaining that PCL had simply changed its name to Ecomed and would continue providing clients with the same services. Finally, the State's expert testified that 96 percent of the checks Ecomed wrote between March 1996 and March 1999 for amounts over $5,000 were made out to Private Clinic, PCL, or Kell P.C. Those payments totaled over $1 million.

Based on the evidence presented, a reasonable factfinder could conclude that Kell maintained control over Ecomed and its Medicaid billings, and he received significant payments from the laboratory. The trier of fact could also find that, although Medicaid paid Ecomed approximately $200 for each urine test conducted between September 1996 and November 1997, the laboratory routinely charged Grady self-pay patients just $19.20 for what Ecomed and Kell employees described as the same test. And the State presented evidence that regulations prohibited providers from billing Medicaid "for an amount greater than the lowest price regularly and routinely

---

[5] *Ney,* supra at 497 (1).
[6] See *Jones v. State,* 272 Ga. 900, 901 (537 SE2d 80) (2000).
[7] Id.

offered to any segment of the general public for the same service or item on the same date(s) of service." Furthermore, the factfinder could determine that Ecomed charged Medicaid to screen patients without a recent history of abuse more than once a month for amphetamines, barbiturates, propoxyphene, and alcohol, despite PCL's statement in the 1994 Grady bid proposal that only monthly testing was necessary. Finally, Kulas testified that Kell told him how much to bill Medicaid for various services, and the State established that, between September 16, 1996, and September 15, 1997, the DMA wrote numerous checks to Ecomed. From this evidence, a reasonable trier of fact could find Kell guilty beyond a reasonable doubt of Medicaid fraud, as charged in the indictment.[8]

(b) *Venue.* Nevertheless, because the State failed to prove venue, we must reverse Kell's conviction. Venue in a criminal case properly lies in the county where the crime was committed.[9] It is an essential element of the crime charged and must be proven by the State beyond a reasonable doubt.[10] Failure to do so "renders the verdict contrary to law, without a sufficient evidentiary basis, and warrants reversal."[11] Kell asserts that proper venue for the Medicaid charge was DeKalb County, where, the State admits, Ecomed submitted its Medicaid billings. The State counters that the fraudulent scheme underlying those billings took place entirely within Fulton County, establishing venue there. In *State v. Johnson*,[12] however, our Supreme Court indicated that "venue for the obtaining of medical assistance benefits [under OCGA § 49-4-146.1 (b) (1)] would be 'the county where a false report was submitted and processed in an attempt to obtain medical assistance.'" Thus, the county to which Ecomed submitted the fraudulent billing records — not the county where they were created — is the proper venue under OCGA § 49-4-146.1 (b) (1), the crime charged in the indictment.[13] And the undisputed evidence shows that Ecomed submitted its bills to Medicaid's fiscal agent in DeKalb County.

In an effort to preserve Fulton County venue, the State argues that *Johnson*'s discussion of OCGA § 49-4-146.1 (b) (1) is dicta. We agree.[14] But the Supreme Court's opinion offers guidance as to where an individual commits the crime of improperly obtaining Medicaid benefits, and we refuse to ignore that guidance. The State further asserts that this dicta stems from the concurring opinion in *State v.*

---

[8] See OCGA § 49-4-146.1 (b) (1) (C).
[9] See *Jones*, supra at 901 (2).
[10] See id.
[11] Id. at 901-902 (2).
[12] *State v. Johnson*, 269 Ga. 370, 372 (2) (499 SE2d 56) (1998).
[13] See id.
[14] See id. (issue presented involved proper venue under OCGA § 16-10-20).

*Barber*,[15] which noted that venue under OCGA § 49-4-146.1 (b) (1) (A) lies in the county where a false Medicaid bill is submitted. According to the State, because it charged Kell under OCGA § 49-4-146.1 (b) (1) (C), rather than OCGA § 49-4-146.1 (b) (1) (A), *Barber*'s venue analysis does not apply.

We disagree. Section 49-4-146.1 (b) (1) prohibits obtaining or attempting to obtain Medicaid benefits by "(A) [k]nowingly and willfully making a false statement or false representation; (B) [d]eliberate concealment of any material fact; or (C) [a]ny fraudulent scheme or device." In contrast to the *Barber* defendant, Kell was charged with obtaining benefits through a fraudulent scheme or device, placing the allegations within subparagraph (C). We cannot find, however, that the means through which the defendant obtains or attempts to obtain Medicaid benefits alters venue. As indicated in *Johnson*, the proscribed conduct — improperly obtaining or attempting to obtain benefits — occurs in the county to which Medicaid billing forms are submitted.[16] Thus, although the fraudulent scheme, false statement, or other activity underlying the crime may take place in a different county, venue under OCGA § 49-4-146.1 (b) (1) lies in the county of submission.[17] Accordingly, the trial court erred in refusing to direct a verdict for Kell on this charge, which should have been prosecuted in DeKalb County.

(c) *Plea of Former Jeopardy.* Kell further argues that the trial court erred in denying his plea of former jeopardy relating to Medicaid fraud. According to Kell, an ultimate issue in this charge — whether he improperly "self-referred" patients to a laboratory in which he held a financial interest — was previously decided favorably to him in a State administrative hearing. In his view, the State was collaterally estopped from relitigating this issue, and double jeopardy barred his prosecution.

The double jeopardy clause embraces the doctrine of collateral estoppel and prevents the same parties from relitigating an issue of ultimate fact previously determined by a valid and final judgment.[18] This doctrine only applies, however, if "[t]he record of the prior proceeding . . . affirmatively demonstrate[s] that an issue involved in the second trial was definitely determined in the former trial."[19] The

---

[15] 260 Ga. 269 (394 SE2d 353) (1990) (Weltner, J., concurring).
[16] See *Johnson*, supra.
[17] See id.; cf. *State v. Barber*, 193 Ga. App. 397, 398 (388 SE2d 350) (1989) (the crime of falsifying a Medicaid document under OCGA § 49-4-146.1 (b) (2) takes place where defendant prepares false document).
[18] See *Sanchez v. State*, 242 Ga. App. 686, 688 (3) (530 SE2d 775) (2000).
[19] (Punctuation omitted.) Id.

mere *"possibility* that an issue may have been determined in the former trial does not prevent the relitigation of that issue."[20]

Although the record on appeal contains Kell's written plea of former jeopardy, no documents relating to the administrative proceeding are attached to that motion. Furthermore, in violation of Court of Appeals Rule 27 (c) (3) (i), Kell's appellate brief does not cite any record evidence supporting his double jeopardy argument. When it responded to Kell's motion, the State submitted to the trial court various orders from the administrative proceeding. Those orders, however, shed little light on the self-referral issue, mentioning only that "[t]he allegations . . . that [Kell] violated the provisions of the Patient Self-referral Act were decided by summary determination." This vague statement tells us nothing about the issue, its scope, or how it was resolved. In short, we do not know what the administrative law judge decided.

Kell has not affirmatively shown by the record that an issue involved in his Medicaid fraud prosecution was definitely determined during the administrative action. Accordingly, we find no error in the trial court's decision denying Kell's plea of former jeopardy.

(d) *Sentencing.* Because we reversed Kell's Medicaid fraud conviction in Division 1 (b), his challenge to the trial court's sentence on that count is moot.

2. Kell also argues that the State presented insufficient evidence to support his conviction for conspiracy to defraud the State. We disagree.

The State alleged that, between June 9, 1995, and July 30, 1999, Kell conspired with Culver to "commit theft of moneys belonging to the State of Georgia," in violation of OCGA § 16-10-21 (a). The State identified numerous overt acts committed in furtherance of this conspiracy, including that both men sought state tax refunds for the 1995 tax year, despite owing tax.

The State presented sufficient evidence to support this allegation. Through tax returns filed in 1996, both Kell and Culver claimed refunds for the 1995 tax year, though the State's expert testified that they actually owed tax. The refunds each sought equaled the amount of tax that had been withheld from their paychecks in 1995. And to justify their refund claim, Kell and Culver submitted similar — if not identical — affidavits to the Revenue Department asserting that they were not bound by the State's income tax requirements. The record further showed that Culver notarized Kell's affidavits.

Based on this evidence, a factfinder could conclude beyond a reasonable doubt that Kell and Culver conspired and schemed to steal money belonging to the State by wrongfully claiming state tax

---

[20] (Emphasis in original.) Id.

refunds.[21] Although they may not have actually received the claimed refunds, the crime of conspiracy to defraud the State is "complete when the conspiracy or agreement is effected and an overt act in furtherance thereof has been committed, regardless of whether the theft is consummated."[22] The evidence, therefore, was sufficient to sustain Kell's conviction under OCGA § 16-10-21 (a).[23]

In this enumeration of error, Kell also complains that the wording of the conspiracy charge in the indictment was deficient in several ways. Even if the indictment was deficient, however, "[a] post-conviction review of an allegation of a defective indictment is one of harmless error."[24] Thus, "[a] defendant who was not misled to his prejudice by any alleged imperfection cannot obtain a reversal of his conviction on this ground."[25] Because Kell has not shown any harm from the alleged deficiency, his conviction will not be reversed on this ground.[26]

3. Kell further argues that the trial court erred in refusing to direct a verdict for him on the three tax evasion counts. He claims that the State presented insufficient evidence of his guilt and failed to prove venue in Fulton County. We find no error.

(a) *Sufficiency of Evidence to Prove Guilt.* In three counts, the State charged Kell with wilfully evading payment of more than $3,000 in state income tax owed in 1996, 1997, and 1998. As defined by OCGA § 48-7-5, a person commits the crime of tax evasion by "willfully evad[ing] or defeat[ing] or willfully attempt[ing] to evade or defeat, in any manner, any [state] income tax, penalty, interest, or other amount in excess of $3,000.00 . . . including but not limited to failure to file a return or report."

The State presented evidence that Kell neither paid state income tax nor filed a state tax return in 1996, 1997, and 1998. Furthermore, in 1996 and 1997, he avoided income tax withholding requirements. And, between 1996 and 1999, Kell paid significant personal expenses out of a First Meliorite Church bank account, into which he deposited checks he received from employee leasing and UD Testing. Finally, the State's tax expert testified that Kell owed more than $3,000 in state taxes for 1996, 1997, and 1998. The expert further

---

[21] See *Thomas v. State*, 215 Ga. App. 522, 523 (451 SE2d 516) (1994) (jury authorized to find appellant guilty of conspiracy to defraud the State based on his participation in conspiracy to wrongfully obtain state tax refunds).

[22] OCGA § 16-10-21 (a).

[23] See *Thomas*, supra; see also *Young v. State*, 205 Ga. App. 357, 363 (5) (422 SE2d 244) (1992) (State need not prove all overt acts alleged in the indictment to sustain conviction for conspiracy to defraud the State; "[t]he crime is complete when the agreement is effected and *an* overt act in furtherance thereof has been committed") (emphasis in original).

[24] *Bullard v. State*, 242 Ga. App. 843, 849 (9) (530 SE2d 265) (2000).

[25] Id.

[26] See id.

explained that a person must have $53,200 in taxable income to owe at least $3,000 in state income tax.

Kell argues that, despite the tax expert's testimony, the State did not prove his tax liability beyond a reasonable doubt because it did not allocate to him every possible itemized deduction that he may have been able to claim in 1996, 1997, and 1998. At trial, however, the State tried to give Kell the benefit of the doubt by asking its expert to assume Kell had $100,000 in deductible expenses, over twice the amount claimed in his 1995 state tax return. Kell's counsel objected to that assumption, and the trial court sustained the objection. Thereafter, the expert factored only the standard deduction and personal exemption into the taxable income formula.

As noted above, Kell did not file state income tax returns in 1996, 1997, and 1998 and thus did not itemize or claim any deductions with the State. And Kell has not cited any evidence that he was, in fact, entitled to itemize any particular amount as a deduction in those years. Furthermore, he refused to allow the State to assume at trial that he was entitled to a significant tax deduction. Under these circumstances, we cannot find that the State failed to prove Kell's tax liability beyond a reasonable doubt. The State is not required to track down every hypothetical tax deduction that an individual might be able to claim. We agree with federal courts that have found

> [w]hile availability of deductions is clearly part of an effective defense to an alleged tax deficiency, a party claiming a deduction must ordinarily establish the right to claim a deduction or an exemption. . . . [A]lthough the burden of proof does not shift in a criminal case, once the government establishes a prima facie case, the defendant must present evidence to overcome the inferences reasonably drawn from the proven facts.[27]

Kell's claim that the State failed to prove the amount of his 1996, 1997, and 1998 income beyond a reasonable doubt also lacks merit. He first argues that the State did not establish that the money he received from employee leasing constituted wages. We disagree. The

---

[27] (Citations omitted.) *United States v. Reed*, 821 F2d 322, 325 (6th Cir. 1987); see also *United States v. Frumenti*, 1991 U. S. App. LEXIS 8814, *8-9 (D) (9th Cir. 1991) ("Once the government establishes a nondisclosure and at least the prima facie existence of a [tax] deficiency, the burden then shifts to the defendant to negate the deficiency by showing that it was wrongly computed or cancelled out by another deduction."); *United States v. Hiett*, 581 F2d 1199, 1202 (II) (5th Cir. 1978) ("In a prosecution for income tax evasion, once the government has established the defendant's unreported income and has allowed both the deductions that the defendant claims and those that it can calculate without the defendant's assistance, it is not then required to prove that the defendant has no other deductions. The burden of proving additional deductions is on the defendant.").

evidence showed that employee leasing issued Kell W-2 forms in 1996 and 1997, reporting his wages. Furthermore, between 1996 and 1998, the company issued him checks approximately every two weeks that were handled along with other employee payroll checks. Although employee leasing's owner refused to characterize these twice-monthly checks as "paychecks" because, at Kell's request, no taxes were withheld, a rational trier of fact could find that these checks constituted income.

Kell also complains that the State included in his 1996 and 1997 income compensation he earned as a PCL officer during fiscal years spanning from October 1, 1995, through September 30, 1996, and October 1, 1996, through September 30, 1997. The record shows that the State pro-rated this compensation, characterizing part as 1996 income and part as 1997 income. Kell objects to this calculation, arguing that the State failed to prove in which year he actually earned the income. Even without the pro-rated PCL compensation, however, the State showed that Kell earned at least $83,294.56 in 1996 and $192,940.75 in 1997. And simply subtracting the personal exemption and standard deduction from those amounts reveals that Kell's 1996 and 1997 taxable income far exceeded $53,200, permitting a rational trier of fact to find beyond a reasonable doubt that Kell owed more than $3,000 in Georgia income tax in those years.

Finally, Kell vaguely argues that his failure to pay taxes in 1996, 1997, and 1998 cannot be viewed as "wilful" because he acted in good faith on his attorney's advice. Pretermitting whether Georgia recognizes an advice of counsel defense in tax evasion cases, Kell has not pointed to any evidence that he, in fact, relied on his counsel's advice concerning tax liability. On the contrary, Kell cites testimony showing that employee leasing asked its attorney, who also represented Kell, for advice on how to handle Kell's claimed withholding exemption. None of this testimony, however, indicates that *Kell* relied in good faith on counsel's advice.

Based on the evidence presented, a rational trier of fact could find beyond a reasonable doubt that Kell wilfully evaded state income taxes greater than $3,000 in 1996, 1997, and 1998 by not paying any tax or filing returns for those years, improperly claiming exemptions from tax withholdings in 1996 and 1997, and concealing income in a First Meliorite Church account, which he used to pay personal expenses. Accordingly, we find the evidence sufficient to sustain his convictions on the three tax evasion counts.[28]

---

[28] See *Spies v. United States*, 317 U. S. 492, 499 (63 SC 364, 87 LE 418) (1943) (construing federal tax evasion statute, Court noted that a wilful attempt to evade taxes could be inferred from "conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets

(b) *Venue*. Kell also challenges venue for the tax evasion charges, asserting that these charges should have been brought in Cobb County, where he lives. We disagree.

As factual support for venue in Cobb County, Kell cites only his residence there. We cannot find, however, that the defendant's county of residence necessarily determines venue in a tax evasion case. Instead, the venue inquiry focuses on where the crime was committed.[29] Our Supreme Court has noted that "studying the key verbs which define the criminal offense in the statute is helpful in determining venue in doubtful cases."[30] Both OCGA § 48-7-5 and the indictment reveal that the key verb in this case is "evaded." Thus, we must determine where Kell evaded state income tax in 1996, 1997, and 1998.

The evidence showed that Kell received income checks from employee leasing and UD Testing at his offices in Fulton County between 1996 and 1998. As requested in Kell's withholding exemption certificates, employee leasing did not withhold state income taxes from its checks in 1996 and 1997. Furthermore, Kell listed his Fulton County office as his "home address" on the certificates. The State also presented evidence that the First Meliorite Church, through which Kell concealed some of his income, was located at Kell's office.

Given this evidence, a rational factfinder could conclude beyond a reasonable doubt that Kell wilfully evaded taxes in Fulton County by receiving paychecks at his Fulton County office that, at his request, did not comply with withholding requirements and were not reported on tax returns; submitting withholding exemption certificates listing his Fulton County office as his home address; and establishing a church in Fulton County through which he funneled his income and paid personal expenses.[31] The trial court, therefore, did not err in refusing to grant Kell a directed verdict on this ground.

4. Finally, Kell argues that venue in Fulton County was improper for Count 4 of the indictment, which charged him under OCGA § 16-10-20 with "knowingly and willfully mak[ing] false writings in his 1995 Georgia income tax return which he caused to be filed with the Georgia Department of Revenue." According to Kell, the State failed to prove beyond a reasonable doubt that he made the false writings in Fulton County, requiring reversal.

---

or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal").

[29] See *Barber*, 193 Ga. App. at 398.

[30] (Punctuation omitted.) *Johnson*, supra at 372 (2).

[31] See *Spies*, supra.

Again, we disagree. Section 16-10-20 prohibits a person from making or using "any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of [the] state government." Proper venue under this Code section depends on whether the person is charged with *making* or *using* the false document.[32] The crime of making a false document occurs where the defendant actually prepares the false writing, rather than where the document is sent.[33] Venue for using a false document, however, rests "in the county in which the document was submitted for use, even if the person charged with using the false document made the document in another county."[34]

Count 4 charged Kell conjunctively with making a false writing *and* using that writing by filing it with the Georgia Department of Revenue. The State, however, was not required to prove Kell violated the statute in both ways.[35] Rather, it could make "a prima facie case upon its establishment by proof of [either] one of them."[36]

The State's tax expert testified that all state tax returns must be filed with the Department of Revenue in Fulton County. The evidence further showed that Kell, in fact, filed his 1995 return with the Revenue Department. Based on this evidence, a rational factfinder could conclude beyond a reasonable doubt that Kell filed his 1995 state tax return in Fulton County. Regardless of where Kell *made* the false writing, therefore, the State proved that he used the false writing in Fulton County. Accordingly, venue for Count 4 was proper in Fulton County.[37]

### Case No. A01A2319

5. In Case No. A01A2319, Culver argues that the State failed to prove him guilty of Medicaid fraud beyond a reasonable doubt. We agree. The State charged Kell and Culver jointly, asserting that they improperly obtained Medicaid payments for themselves through a fraudulent scheme or device. On appeal, however, the State has made no real effort to link Culver to the Medicaid fraud, and our review of the evidence shows no such link.

---

[32] See *Johnson*, supra.

[33] See *Spray v. State*, 223 Ga. App. 154, 157-158 (2) (476 SE2d 878) (1996).

[34] *Johnson*, supra.

[35] See *Stander v. State*, 226 Ga. App. 495, 497 (1) (486 SE2d 712) (1997):

[36] (Punctuation omitted.) Id.; see also *Locklin v. State*, 228 Ga. App. 696, 697 (1) (a) (492 SE2d 712) (1997) ("When an indictment alleges that a crime was committed in more than one of the separate ways specified by the statute, the State need only prove the crime was committed in one of those separate ways.").

[37] See *Johnson*, supra.

The indictment vaguely alleged that Culver helped arrange the sham sale of PCL's assets to Servicios. Yet, at trial, the State proved only that Culver was Kell's "right hand man," served as secretary of PCL, acted as Ecomed's registered agent, and witnessed signatures on certain documents relating to the sale. Based on the evidence presented, no rational trier of fact could find Culver guilty beyond a reasonable doubt of Medicaid fraud. Culver had an extremely minor role in the actual transaction between PCL and Servicios, and the State offered no evidence that he helped arrange the sale. In its brief, the State notes that Culver witnessed the Servicios representative's signature on the trust agreement appointing Bailey as trustee, but later told investigators that he did not recall meeting the representative. That evidence, however, does not prove Culver's participation in the scheme beyond a reasonable doubt.

The State has pointed to no evidence that Culver took part in the Medicaid billings or Ecomed's drug testing, profited from improper billings, or had any substantive involvement in PCL's sale to Servicios.[38] Although the evidence showed that Culver was Kell's "right hand man," that position does not prove him guilty of Medicaid fraud. Culver's conviction under OCGA § 49-4-146.1 (b) (1), therefore, must be reversed.

6. Culver similarly challenges the sufficiency of the evidence supporting his conviction for conspiracy to defraud the State. As we found in Division 2, however, a rational factfinder could reasonably conclude that Culver conspired with Kell to steal money belonging to the State by wrongfully claiming state tax refunds. And although Culver, like Kell, challenges the wording of the indictment, he has not shown that any alleged deficiency in the language of the conspiracy charge harmed him.[39] Accordingly, this challenge lacks merit.

7. Culver further argues that venue for Count 3, which charged him with "knowingly and willfully mak[ing] false writings in his 1995 Georgia income tax return which he caused to be filed with the Georgia Department of Revenue," did not lie in Fulton County. In Division 3, we rejected a similar argument raised by Kell, and those principles govern here. The State properly brought Count 3 in Fulton County, where Culver submitted his 1995 tax return.

8. Given our decision in Division 5, Culver's remaining enumerations of error are moot.

*Judgment affirmed in part and reversed in part in Case Nos. A01A2319 and A01A2339. Johnson, P. J., and Ellington, J., concur.*

---

[38] Compare *Bullard*, supra at 843-844 (1) (although defendant did not actively participate in actual billing of Medicaid claims, evidence supported Medicaid fraud conviction because State showed that she took part in overarching fraudulent scheme).

[39] See id. at 849.

DECIDED MARCH 1, 2002 —
RECONSIDERATIONS DENIED MARCH 19, 2002 — 

*Thomas C. Rowsey*, for appellant (case no. A01A2319).

*Furlong & Franco, Leonard L. Franco*, for appellant (case no. A01A2339).

*Paul L. Howard, Jr., District Attorney, Thurbert E. Baker, Attorney General, Harrison W. Kohler, Senior Assistant Attorney General*, for appellee.